**KAHN et al. v. NIAGARA LAUNDRY & LINEN SUPPLY CO. et al.**

(Circuit Court of Appeals, Sixth Circuit. January 15, 1926.)

No. 4210.

1. **Admiralty ⬅57—Bond obligating payment of libels arising before certain date held to contemplate usual procedure.**

Bond, given under Rev. St. § 941, as amended by Act March 3, 1899 (Comp. St. § 1567), obligating obligor to pay judgments on libels which had been or might be filed, *held* to secure only those claims which should be materialized by suits brought in rem, while there continued in existence a res subject to such suits.

2. **Admiralty ⬅57—Independent remedies under bond held not to survive sale in equity suit.**

Independent remedies of libelants on bond given under Rev. St. § 941, as amended by Act March 3, 1899 (Comp. St. § 1567), would not survive a sale of the boat in admiralty proceedings, where ample opportunity had been given to join and prove claim, and did not survive sale in equity in combined foreclosure suit and creditors' bill.

Appeal from the District Court of the United States for Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Libel by the Niagara Laundry & Linen Supply Company against the steamer Theodore Roosevelt, claimed by the Cleveland-Erieau Steamship Company, in which other parties filed intervening libels, and answer was filed by I. T. Kahn and another. From a decree for libelant (291 F. 453), I. T. Kahn and another appeal. Decree set aside, and petition dismissed.

Carl A. Schipfer, of Cleveland, Ohio (Kelley, David & Cottrell, Hermon A. Kelley, and G. W. Cottrell, all of Cleveland, Ohio, on the brief), for appellants.

Geo. B. Marty, Dorr E. Warner, and Theo. C. Robinson, all of Cleveland, Ohio (Holding, Masten, Duncan & Leckie and John A. Cline, all of Cleveland, Ohio, on the brief), for appellees.

Before DENISON, DONAHUE, and KNAPPEN, Circuit Judges.

DENISON, Circuit Judge. The opinion of the District Judge, reported in The Theodore Roosevelt, 291 F. 453, fully states the facts and the questions involved. They all lead up to the controlling problem—a determination of the character and effect of the $130,000 bond given by the appellants. This must be decided upon the principles involved, and as a new question; we find no helpful precedent.

This bond is said to have been given "under favor" of the amendment of March 3, 1899, to R. S. § 941 (Comp. St. § 1567). In one respect it is not the statutory bond; the law contemplates and regulates a bond to secure the claimants in all future suits brought against a vessel; this present bond reaches only future suits, based on now existing claims. At the same time, as far as it goes, it takes its effect from the statute, and it must take its character and legal intent from the same source. We see no sufficient reason why, in its present application, it should be given a construction different from what it would have had, if it had secured future claims as well. Such a bond may be thought of either as in effect an obligation to pay, at all events, the debts falling within its scope, or instead as a bond of indemnity, placing

the claimant in the position he would have had if he might have arrested the ship, though he did not. It is quite plain that in some senses the bond is a substitute, not for the vessel, but for the power to arrest. This conflict of thought is made most concrete by supposing that the vessel, after giving the complete statutory futurity bond, is completely lost, after the future obligation accrued, but before any opportunity for actual arrest was waived in reliance on the bond, and before the beginning of any suit against the vessel with notation on the bond as a substitute for arrest. The District Judge assumed that the remedy by suit against the bond would continue, although the ship was out of existence.

We do not see that it is necessary to decide this supposed concrete question; but we think the bond should be read as being consistent with and as furnishing one means of carrying out common and familiar admiralty principles and procedure, rather than as marking a novel and distinct departure therefrom. In 1899 it had long been the established admiralty practice that the first libel filed, and under which arrest was made, became the principal case. Other lien claimants who came along were, in effect, if not in name, intervening libelants. The process issued for them, to the marshal already in possession of the vessel, was only noted by him. A monition was issued and published, and all lien claimants were invited to intervene and establish their demands. In due time—lacking successful defense—a final decree was rendered for condemnation and sale, and distribution of the proceeds was made among the lien claimants who had intervened; those who had not done so lost their lien upon the ship, and had no recourse by way of any lien, unless, under some circumstances, upon the surplus, if there was one. We cannot doubt that the common familiarity with proceedings of this character furnished the background against which the new statute should be seen. Any other resulting situations—that is, any situation in which, although the ship was sold, there remained a liability on the bond, to be enforced piecemeal by one claimant after another until the statute of limitations should run—must, against this background, be so unnatural it should not be inferred, except from the clearest language in the statute or bond.

We find no such clear language. On the contrary, the theory that the bond is completely and permanently substituted for the ship is inconsistent with the provision that the substitution ends whenever some subsequent suit is commenced, which raises the to-

tal claims from 49 per cent. to 51 per cent. of the bond. The only procedural effect of the bond—the stay of process—thereupon ceases. Further, the condition is to answer the decree in any case that may be brought "against the said vessel." It is not natural to think of any procedure in rem "against the vessel" after the vessel has disappeared from actual existence, as by sinking, or from the field of legal liability, as by admiralty sale. The statute further provides that "like remedies" may be had as if the ordinary bond had been filed pursuant to the ordinary libel. As has been pointed out, the customary remedy in such a case involves a monition and the taking of an account of all lien claimants in the same class—all as preliminary to a final decree of sale.

The general principle of equity—and likewise, we take it, of admiralty—that all claims of one class should be treated alike makes it imperative that there should be, under such a bond, some proceeding where all can come in and have their respective rights determined. The principle involved is no different when the bond is ample for all than when it is insufficient; yet, in the latter case, individual recoveries, to the prejudice of unknown claimants, would not be approved in equity.

[1] Further, a study of the precise language of this bond confirms the conclusion that there was no intent to substitute the bond for the ship in a permanent way. The fact was that the receiver, in possession of the ship on behalf of all creditors, was chartering the ship to be taken out of the district and there operated by the charterer. The receiver was bound to protect the charterer from seizure on the existing claims, or else the charter could not be made. To avoid such interference, and to confine the litigation to the occupied forum, were the objects. The bond recites that libels had been, and from time to time may be, filed against the vessel in this district upon existing claims, and that it is desired to avoid delay from such seizures and indemnify the officers for not seizing "under said libels," and the pertinent condition is that the obligor "pay such judgment as shall be awarded in any or every such proceeding or proceedings." There is thus direct reference to the pending proceeding, and we think the natural inference is that the usual procedure was contemplated, and that only those claims were to be secured which should be materialized by suits brought in rem, while there continued in existence a res subject to such suits.

[2] The theory that the bond is substituted

for the ship, if adopted, should be followed to its logical conclusion. After there has been an accounting of liabilities and a judicial sale, the ship is no longer subject to attachment. If the bond is a complete substitute, it should be similarly exempt. It is true that the debts of appellees were among those at first covered by the bond; but the conduct of appellees does not call for any relaxation of the customary rules which confine the obligee within the limits of his contract. The creditors' bill was filed and the receiver appointed September 24, 1920. On January 21, 1921, libels in admiralty were filed by the Pittsburg Coal Company (No. 2736) and others. Others were filed from time to time until May 14, and doubtless warrants of arrest were issued. After May 14, when this bond was filed, other intervening libels in this same case were filed from time to time until June 13. Thereafter nothing was done until December 17, when the boat was returned to the charterer.

On that date a monition was issued in 2736, directing "all persons claiming" to appear on a day named and "make their claims." Lien creditors holding $53,000 of claims appeared as libelants and were included in the final decree; but this decree, instead of providing for the sale of the boat, found the present appellants liable, as sureties, upon the present bond, and directed them to pay this $53,000, which they did. Appellees, with $14,000 of similar claims, did not appear. Early in March appellees asked for process of arrest of the boat. March 29 these applications were denied, because it was thought the right of action was against the bond. The sale took place on April 3, and these petitions against the bond were filed on April 8. From May 14, 1921, when the bond was given, until January, 1922, when the final decree in 2627 was made, and further until after April 3, when the boat was sold, appellees did nothing as against the bond. On the contrary, they filed their claims in the equity case before the master; and although we do not find therein any waiver of whatever rights under the bond they might have, it is significant that they did not seem to construe the bond as they do now.

Upon the whole, we are well satisfied that independent remedies under this bond would not survive a sale of the boat in admiralty proceedings, in situations where there had been, before sale, ample opportunity to join and prove the claim. Does it make any difference that, after the claims had been proved in admiralty, it was decided that the ac-

10 F.(2d)—2

tual sale should take place in the equity suit, under the combined foreclosure and creditor's bill? We think not. The reason for exemption from further in rem liability was the same, and those considerations which tend to conform the bond to the ordinary admiralty procedure were the same. The form which the sale took, as a matter of convenience, ought not to be important.

We are not impressed with the claim of estoppel dependent on the price which the sureties paid when they purchased the boat at the sale. They had then paid $53,000 of lien claims because of their bond liability, and, in order to get the boat at the sale, they were willing to pay also some $20,000 of prior cost and expenses. If the appellees' $14,000 had before then been enforced against the appellants and their investment had become $87,000, it is not probable that they would have taken any different action about assuming and paying the prior liens.

We are compelled to think that the decree should be set aside, and that the petition of appellees, filed in the court below, should be dismissed.